2023 IL App (1st) 220728

No. 1-22-0728

Second Division
March 31, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| MARIA SALCEDO, Widow of Chicago Police Officer, Ruben Salcedo, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| | ) | No. 2021 CH 3035 |
| THE RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, | ) ) ) | Honorable Alison C. Conlon |
| | ) | Judge, presiding. |
| Defendant-Appellee. | ) ) | |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Justices Howse and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1     While on duty in 2008, Chicago police officer Ruben Salcedo suffered various injuries, including traumatic brain injury, as a result of a motor vehicle accident. Following his accident, Salcedo was awarded a duty disability pension, which he received until his mandatory retirement from the Chicago Police Department (CPD) at age 63 in 2015. After Salcedo's death in 2018, his widow, plaintiff, Maria Salcedo, initially filed a claim for a widow's compensation annuity benefit

pursuant to section 5-144 of the Illinois Pension Code (Code) (40 ILCS 5/5-144 (West 2020)).[1] Following an evidentiary hearing, the Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago (Board) denied plaintiff's claim on the basis that Salcedo's mandatory retirement rendered plaintiff ineligible to receive the supplemental annuity. Plaintiff appealed the Board's final administrative decision to the circuit court of Cook County, which affirmed the Board's decision. On appeal, plaintiff argues that the Board erred in determining that Salcedo's retirement prohibited her from receiving a supplemental annuity. For the reasons that follow, we affirm.

¶ 2                                I. BACKGROUND

¶ 3        Section 5-101 of the Code establishes the creation of the Policemen's Annuity and Benefit Fund in Chicago (the fund). *Id.* § 5-101. The fund was created and maintained "for the benefit of its policemen, their widows and children, and of all contributors to, participants in, and beneficiaries of any police pension fund in operation." *Id.* The fund is administered by the Board. *Id.* §§ 5-108, 5-178.

¶ 4        Pursuant to the Code, the Board's duties and responsibilities include, among others, the creation of rules and regulations necessary for the administration of the fund, including approval of any payment for any annuity, pension, or benefit. *Id.* §§ 5-195, 5-189. The granting, increase, reduction, or suspension of any benefit or annuity must be approved by a majority vote of the members of the Board, following appropriate notice and an opportunity to be heard. *Id.* §§ 5-189, 5-182.

---

[1]Although plaintiff's application initially sought a widow's compensation annuity, plaintiff's counsel communicated to the Board that the application was instead for a widow's supplemental annuity, the impact of which we discuss later in this disposition.

¶ 5 The fund authorizes disbursement of disability benefits for officers who are injured in the line of duty. Section 5-154 provides for disbursement of a "duty disability benefit" for any "active policeman who becomes disabled on or after the effective date as the result of injury incurred on or after such date in the performance of an act of duty." *Id.* § 5-154(a).[2] A disabled police officer must provide proof of a disability to the Board at least once a year, unless the Board makes a finding that the officer's injury has resulted in a permanent disability. See *id.* §§ 5-156, 5-154(a)(iii).

¶ 6 A disabled police officer may receive a duty disability benefit "*until the policeman becomes age 63 or would have been retired by operation of law*, whichever is later." (Emphasis added.) *Id.* § 5-154(c). "Thereafter[,] the policeman shall receive the annuity provided in accordance with the other provisions of [the Code]." *Id.* Such annuities are colloquially referred to as "life annuities" but are called "prior service" and "age and service" annuities within the Code. See *id.* § 5-121 ("Prior service annuity, age and service annuity *** shall consist of equal monthly payments for life with the first payment payable one month after the occurrence of the event upon which payment shall depend."); see also *id.* §§ 5-122, 5-123.

¶ 7 The Code also provides for the granting of similar benefits for wives and widows of police officers, such as a widow's annuity and widow's prior service annuity. See *id.* §§ 5-121, 5-133 to 5-147.1. Relevant here, the Code also grants benefits and annuities to widows of officers whose deaths resulted from on-duty injuries. *Id.* § 5-144. Specifically, a widow may receive a "compensation annuity" and a "supplemental annuity" as defined in section 5-144. *Id.* A widow is

---

[2]"Policeman" is defined in the Code, in part, as "(a) An employee in the regularly constituted police department of a city appointed and sworn or designated by law as a peace officer with the title of policeman[.]" 40 ILCS 5/5-109(a) (West 2020). "Policeman" is also gender-inclusive. See *id.* § 5-109.1.

eligible for a compensation annuity if the "widow of a policeman whose death, on or after January 1, 1940, *results from injury incurred in the performance of an act or acts of duty*." (Emphasis added.) *Id.* § 5-144(a). The amount of the compensation annuity is determined by calculating

> "the difference between the annuity and an amount equal to 75% of the policeman's salary attached to the position he held \*\*\* that would ordinarily have been paid to him as though he were in *active* discharge of his duties \*\*\* *until the policeman, had he lived, would have attained age 63*." (Emphases added.) *Id.*

The total amount of the widow's compensation annuity, when combined with any potential children's annuity award, cannot exceed the amounts set forth in section 5-152 of the Code.[3] *Id.*

¶ 8    A widow is eligible for a "supplemental annuity" "*[u]pon termination* of the compensation annuity." (Emphasis added.) *Id.* § 5-144(b). This amount is

> "equal to the difference between the annuity for the widow and an amount equal to 75% of the annual salary (including all salary increases and longevity raises) *that the policeman would have been receiving when he attained age 63 if the policeman had continued in service at the same rank \*\*\* that he last held in the police department*." (Emphasis added.) *Id.*

Significantly, a widow is not entitled to either a compensation or supplemental annuity unless "the death of the policeman was a direct result of the injury, *or the injury was of such character as to prevent him from subsequently resuming service as a policeman*." (Emphasis added.) *Id.* § 5-144(c).

---

[3]Section 5-152 governs the disbursement of annuities for parents and children of police officers. See 40 ILCS 5/5-152 (West 2020).

¶ 9     In order to receive either a compensation or supplemental annuity, the widow must apply to the Board and accompany the application with a sworn affidavit regarding the specific details of the "time, place, and events supporting or related to the application."[4] Retirement Bd. of the Policemen's Annuity & Benefit Fund of Chi. R. 4.2(b) (adopted Mar. 25, 2021). The application must also include "relevant medical, psychological, and related records from all health care providers providing treatment, diagnoses, or  evaluation of the applicant for any condition related to [the] request for *** benefits." Retirement Bd. of the Policemen's Annuity & Benefit Fund of Chi. R. 4.2(c) (adopted Mar. 25, 2021). The Board may hold an evidentiary hearing on the application and may also subpoena witnesses or documents for resolution of the request. Retirement Bd. of the Policemen's Annuity & Benefit Fund of Chi. Rs. 7.1, 14.1 (adopted Mar. 25, 2021).

¶ 10                                A. Background

¶ 11                    1. Salcedo's Injury and Receipt of Various Disability Benefits

¶ 12     On September 18, 2008, while on duty, Salcedo was involved in a high-speed motor vehicle accident and was ejected from his vehicle, sustaining various injuries to his left shoulder, left acromioclavicular joint, right knee, and head.

¶ 13     On January 28, 2010, the Board awarded Salcedo a duty disability pension of 75% of his salary at the time of his accident. This award was memorialized in a letter to Salcedo on April 1, 2010, which stated that he was entitled to his duty disability benefits while the original duty disability persisted or until Salcedo's "attainment of age 63 or [where he] would have been retired

---

[4]A copy of the Board's "Hearing Rules and Procedures" is included within the record.

by operation of law, whichever is later." The letter further advised that upon formal resignation from the department, he would then begin to receive a "life annuity."

¶ 14    On October 29, 2015, Salcedo reached the age of 63 and was mandatorily retired from CPD. Subsequently, on November 24, 2015, the Board awarded Salcedo a life annuity, which was memorialized in a letter to him on December 11, 2015.

¶ 15    On July 23, 2018, Salcedo passed away at the age of 65. Per his death certificate, the cause of death was gastrointestinal hemorrhage, esophageal varices, and decompensated cirrhosis. On September 28, 2018, the Board awarded plaintiff, as Salcedo's widow, a monthly lifetime annuity benefit, which was memorialized in a letter on October 12, 2018.

¶ 16                      2. Plaintiff's Claim for a Widow's Annuity

¶ 17    On January 11, 2021, plaintiff filed a claim for a widow's compensation annuity benefit. In the claim, Plaintiff acknowledged that she was receiving a "standard widow's annuity" and that she was "entitled to a widow's compensation annuity, per 40 ILCS 5/5-144(c), retroactive to the date of his death." In support of her application, she attached (1) her own affidavit; (2) the affidavit of Dr. Michael G. Maday; (3) the affidavit of Dr. Joseph P. Laluya; (4) the affidavit of Dr. Muhannad Kayali; and (5) various medical records, which, according to plaintiff, indicated that "but for [Salcedo's] death, his on-duty injuries would have prevented him from subsequently or ever, resuming service with the police department." Plaintiff's affidavit averred as to her observations of the accident's effect on her husband until his death.

¶ 18    Dr. Maday's affidavit averred that he treated Salcedo for multiple medical conditions related to his accident. Dr. Maday authored a medical opinion in September 2013, which was attached to his affidavit, and opined that Salcedo was "permanently and totally disabled from returning to police duty, whether light or full duty." Dr. Maday further opined that the disability

would have continued throughout the remainder of Salcedo's life, regardless of his death on July 23, 2018, and that his disabilities prevented him from "subsequently resuming service as a policeman for the remainder of his expected life."

¶ 19    Dr. Laluya's affidavit averred that he had treated Salcedo for multiple medical conditions, including a head contusion, concussion, traumatic brain injury, dizziness, post traumatic headaches, left shoulder, and rotator cuff and right knee tears. Dr. Laluya further stated that he authored a September 23, 2013, letter, which provided that, "based on a reasonable degree of medical certainty, Salcedo was permanently and totally disabled from returning to any police duty, whether light or full duty, and that the disability would have continued throughout the remainder of his life, regardless of his untimely death."

¶ 20    Lastly, Dr. Kayali's affidavit, dated November 2, 2020, averred that he had treated Salcedo for multiple injuries, including for concussion, traumatic brain injury, dizziness, migraine-like headaches, left shoulder, rotator cuffs, knee pain, low back pain, generalized weakness, and instability of both feet and fatigue. Dr. Kayali opined that, "based on a reasonable degree of medical certainty," Salcedo was "permanently and totally disabled from returning to any police duty, whether light or full duty, and that the disability would have continued throughout the remainder of his life, regardless of his untimely death."

¶ 21                                B. Board Proceedings

¶ 22    On April 29, 2021, the Board held an evidentiary hearing on plaintiff's application. When introducing plaintiff's claim, one of the Board members indicated that the Board was "ready to hear the widow's compensation annuity hearing in the case of Officer Ruben Salcedo." The hearing officer further stated that the hearing was being conducted pursuant to section 5-144(c) of

the Code "to determine the enhanced widow's annuity claim." However, in plaintiff counsel's opening statement, counsel referred to the requested annuity as a "supplemental annuity."[5]

¶ 23    Subsequently, prior to the beginning of the hearing, the hearing officer indicated that there were two possible issues to be resolved by the Board: first, "the medical issue" and, second, a "legal issue in light of the fact that *** Salcedo passed away after he was retired at age 63 due to the mandatory retirement age." Following opening statements, the hearing officer asked again, "[W]hat role does the mandatory retirement age factor in here[?]" He further stated, "I'm certainly going to think about that because I think you might want to address that if the Board has any questions about that because *** Salcedo, obviously, has been mandatorily retired off of disability at age 63 and passed after that. *** That's something I think that the Board is going to want to maybe hear from you about."

¶ 24                          1. Evidence Admitted at the Hearing

¶ 25    Various exhibits were admitted into the record without objection, including the affidavits, opinions, and medical reports previously filed with plaintiff's request. The Board also admitted an independent medical examination report conducted on December 7, 2009, by Dr. Nikhil N. Verma, and a "police disability pension status evaluation" conducted by Dr. Peter Orris on July 7, 2014.

¶ 26    Dr. Verma's report stated that he had conducted an independent medical examination of Salcedo's left shoulder and right knee. Dr. Verma opined that Salcedo's right knee injury was causally related to the motor vehicle accident but would not alone prevent him from returning to full duty. Dr. Verma also opined that Officer Salcedo's shoulder injury was causally related to the

---

[5]As earlier noted, plaintiff's original application to the Board sought a "compensation annuity." Consistent with plaintiff's counsel's characterization of the request as one for "supplemental annuity," throughout the proceedings, the Board characterized the request as such. On appeal, plaintiff argues error in the Board's denial of a "supplemental annuity."

accident, and that after surgery and physical therapy, Salcedo would be able to return to "at least a medium duty position" and would have "normal ability to protect and discharge his weapon as well[,] as he does possess the current ability to ambulate immediately." However, Dr. Verma cautioned that Salcedo "may require restrictions with regard to the left shoulder[,] specifically with regard to overhead strength or function" and at the time of examination, he had "not reached maximum medical improvement."

¶ 27     Dr. Orris's evaluation indicated that Salcedo's memory was continuing to improve and that his vertigo issues were being helped by medication. However, Dr. Orris observed that Salcedo was still suffering from headaches and residual pain from his injuries, for which he took various medications. Dr. Orris further observed that Salcedo's neurologist had reported that he "ha[d] lasting brain damage." Dr. Orris opined that Salcedo remained "disabled due to problems resulting from his on-duty motor vehicle accident in 2008" and that he "remain[ed] under active therapy of his neurologist." Dr. Orris further reported that Salcedo also had diabetes, hypertension, and hypercholesterolemia.

¶ 28                                    2. Plaintiff's Testimony

¶ 29     Plaintiff's testimony was detailed and extensive. We recite only a portion of the more salient aspects of it here. Plaintiff testified that, to her understanding, her husband was awarded duty disability benefits in 2010. Plaintiff testified that her husband had enjoyed being a police officer and wanted to return to duty.

¶ 30     As to her husband's memory issues, plaintiff testified that they continued from the date of injury to the date of his death and that sometimes he could not remember her or their children. He also could not remember "basic things that he would do in his daily life," such as how to put on his shoes and being able to dress himself without being reminded to do so. Plaintiff further testified

that she could never leave her husband alone at home, because on one occasion, he had been in the kitchen, turned on, and failed to turn off the stove burners.

¶ 31    Plaintiff testified that her husband also suffered from dizziness from the date of injury to the date of his death and that it affected his ability to stand and walk. He would also get "migraine-type" headaches approximately four to five times a week and took monthly prescribed medication to alleviate them.

¶ 32    Plaintiff testified that her husband would complain about pain in his left clavicle, right knee, and lower back about four times a week until the day he died. Plaintiff stated that Salcedo could only walk about halfway down the block with his walker before he would start complaining of back or knee pain, or he would have dizzy spells when walking. His pain medications included Tramadol, Naxproxen, Ibuprofen, Tylenol, and Hydrodocodone, which would be tapered off on occasion. However, in 2016 or 2017, plaintiff testified that her husband's liver condition started to worsen, and the doctors took him off Tramadol.

¶ 33    Plaintiff bathed and showered him daily, and when he used the bathroom, she would stand in the doorway to make sure he did not fall over. Plaintiff dressed him and cooked for him and noted that she would have to place him in a chair and use a strap to keep him in place as he would otherwise fall over. Sometimes she would have to feed him as his hands shook while he ate. Plaintiff further testified that her husband's activities were limited after his injury. His hobbies before his injury included boxing and watching antique car shows, and after his injury, he would watch such events on television.

¶ 34    On cross-examination, plaintiff testified that Dr. Maday had treated her husband for orthopedic injuries, with the last visit sometime between 2012 and 2014 or 2015. She stated that Dr. Laluya had also treated him for pain and had removed the staples and stitches from her

husband's head. Her husband also attended physical therapy upon Dr. Laluya's recommendation. Plaintiff testified that her husband also saw Dr. Kayali, the family physician, and Dr. Fiolio, a gastroenterologist. Her husband had also been treated for his head trauma by various neurologists at Loyola Hospital, with the last visit either in 2012 or 2015. Plaintiff testified that her husband passed away at Rush Hospital, where he had previously been accepted in June 2018 to participate in a liver transplant program.

¶ 35                          3. Dr. Peter Orris's Testimony

¶ 36     The Board called Dr. Orris, the Board's examining physician. He was shown a copy of his report previously introduced into evidence and confirmed that he performed an annual independent medical examination of Salcedo on behalf of the Board on or about July 17, 2014. He did not examine him further after this visit.

¶ 37     Dr. Orris testified, within a reasonable amount of medical certainty, that Salcedo was still disabled from his motor vehicle accident. He testified that Salcedo was still having memory problems, though he had reported improvement. Salcedo was also still suffering from dizziness, and was taking medication for it. He also still had some of the same musculoskeletal injuries that he had sustained from the accident, despite having surgery. Dr. Orris stated that Salcedo's "main disabling factor" was his central nervous system problems, which were "undoubtedly permanent." Dr. Orris further testified that, within a reasonable degree of medical certainty, the motor vehicle accident rendered Salcedo unable to return to duty as a Chicago police officer.

¶ 38     Dr. Orris testified, over objection, that he had reviewed various medical reports regarding Salcedo's death, which indicated that his death was caused by hepatic cirrhosis, liver cirrhosis, and swelling of the blood vessels in his esophagus, which was caused by the hepatic cirrhosis. Dr. Orris

testified that it was not clear from the medical reports how these conditions came to be, and he could not render an independent opinion on the cause of death.

¶ 39                                    C. The Board's Decision

¶ 40    At closing argument, plaintiff's counsel was again asked by the hearing officer as to whether the Code's "provision regarding mandatory retirement age *** ha[d] any effect on the widow's ability to come back after that retirement to seek enhanced benefits." Plaintiff's counsel responded that he did not believe the mandatory retirement age had any effect on receiving such benefits. One of the Board members then inquired as to whether Salcedo had ever applied for "total and permanent disability benefits" pursuant to the Code. Plaintiff responded that she did not know.

¶ 41    Immediately thereafter, the Board denied plaintiff's claim by a vote of 6 to 2 and issued a written order memorializing its decision on May 27, 2021. As an initial matter, the Board stated that, to be eligible for a widow's supplemental annuity, plaintiff needed to establish that the death of her husband was either a direct result of his injuries of the 2008 motor vehicle accident or that his injury was of such character as to prevent him from subsequently resuming service as a policeman. The Board further noted that Salcedo had turned 65 years old on October 29, 2015, and thus, in accordance with section 5-154(c) of the Code, his disability payments had terminated at age 63 and then converted to a lifetime annuity benefit, of which he had been in receipt to the date of his death.

¶ 42    Turning to the merits of the claim, the Board observed that it was "faced with conflicting statutory provisions" and that there was no direct authority on point with this issue. Ultimately, the Board determined that plaintiff was ineligible to receive a supplemental annuity because, regardless of his disability, Salcedo could not have returned to service after he was mandatorily retired in 2015. According to the Board, section 5-154(c) of the Code was "clear and

unambiguous" that an officer who was subject to disability payments was "mandatorily retired" at age 63, and thus, Salcedo's "inability to return to duty" was not a result of his disability but rather his mandatory retirement. Moreover, the Board continued, there was "no exception allowing for [a] Supplemental Widow's Annuity Benefit after mandatory retirement." As such, reasoned the Board, granting plaintiff a supplemental annuity after her husband's retirement would render an "absurd result" and cause a "monumental financial impact" to the fund, which "surely the Legislature did not intend *** when it enacted [section] 5-144(c)."

¶ 43    Accordingly, the Board concluded that "Salcedo's mandatory retirement at age 63, just prior to his death, precluded him from resuming service as a Chicago police officer," which prohibited his widow from receiving a supplemental annuity benefit. As such, the Board did not address whether plaintiff had met her burden in showing that Salcedo's injuries were of such a character as to prevent him from subsequently resuming service as a policeman.

¶ 44                         D. Administrative Review

¶ 45    On June 22, 2021, plaintiff timely filed a complaint for administrative review of the Board's decision, which alleged that the Board's decision was contrary to law, legally erroneous, an abuse of discretion, against the manifest weight of the evidence, and arbitrary and capricious. On or about July 27, 2021, the Board filed its answer consisting of the underlying administrative record.

¶ 46    On March 8, 2021, the circuit court heard oral argument on the complaint for administrative review and took the matter under advisement. As an initial matter, the circuit court determined that the correct standard of review was "clearly erroneous," as the issue was one of both law and fact. However, the court noted that it would reach the same conclusion under a *de novo* standard of review, and as such analyzed plaintiff's complaint under both standards. Ultimately, the court

found that "mandatory retirement [was] an intervening event that preclude[d] supplemental annuity under [section] [5-]144(c)." Accordingly, on April 22, 2021, the court issued a written order, denying plaintiff's complaint. Plaintiff timely filed her appeal.[6]

¶ 47                                    II. ANALYSIS

¶ 48                               A. Standard of Review

¶ 49     The parties dispute the standard of review to be applied to the Board's decision. Our review of administrative proceedings is based on the decision of the administrative agency, rather than that of the circuit court. *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 551-52 (2009). Judicial review of the Board's decision is governed by article III of the Code of Civil Procedure. See 40 ILCS 5/3-148 (West 2020); 735 ILCS 5/art. III (West 2020).

¶ 50     "An administrative agency's findings of fact are deemed *prima facie* true and correct." *Swoope v. Retirement Board of the Policemen's Annuity & Benefit Fund of Chicago*, 323 Ill. App. 3d 526, 528 (2001); see also 735 ILCS 5/3-110 (West 2020). "Determinations as to weight of the evidence and credibility of the witnesses are matters left to the agency and will not be disturbed on review unless they are against the manifest weight of the evidence." *Swoope*, 323 Ill. App. 3d at 529. "A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.* "If the record contains any evidence to support the agency's decision, it should be affirmed." *Id.*

---

[6]Illinois Supreme Court Rule 303 (eff. July 1, 2017) provides that a notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment that the party seeks to appeal. Here, the circuit court issued its final order on plaintiff's complaint on April 22, 2022. Accordingly, notice of appeal was due on May 22, 2022, which fell on a Sunday. Plaintiff's notice, filed on Monday, May 23, 2022, 31 days after the final decision, was nonetheless timely. See *In re Estate of Malloy*, 96 Ill. App. 3d 1020, 1025 (1981) (Sundays and legal holidays are not counted for purposes of computing the 30-day filing period for notices of appeal); see also 5 ILCS 70/1.11 (West 2020). Accordingly, our jurisdiction over this appeal is proper.

¶ 51    However, an administrative agency's conclusions of law are afforded less deference and are reviewed on a *de novo* basis. *Id.* "When the agency's determination involves a mixed question of fact and law, the applicable standard of review is the clearly erroneous standard, which falls between a manifest weight of the evidence standard and *de novo* review, so as to give some deference to the agency's experience and expertise." *Id.* "An agency is presumed to make informed judgments based on its experience and expertise and, thus, substantial deference is given to its interpretation of a statute." *Id.*

¶ 52    Plaintiff argues that the circuit court erred in applying the "clearly erroneous" standard because the issue before the circuit court had been purely one of statutory interpretation, where the facts before the Board were undisputed, and the Board did not address whether Salcedo had been permanently disabled, citing *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191 (1998), *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380 (2001), and *Summers v. Retirement Board of the Policemen's Annuity & Benefit Fund of Chicago*, 2013 IL App (1st) 121345, in support.

¶ 53    The Board disagrees, arguing that the circuit court correctly analyzed the Board's decision under the clearly erroneous standard because the administrative record presented a mixed question of law and fact. Specifically, the Board contends that the circuit court reviewed "unique facts" when analyzing the pertinent parts of the Code, such as Salcedo's receipt of duty disability benefits until his retirement, that his disability benefits converted into a retirement annuity thereafter, and that he passed away at age 65 for unrelated medical reasons. The Board asserts that, even if the facts are undisputed, it nevertheless took in evidence and did not simply interpret the Code purely on its language.

¶ 54    We agree with the plaintiff that this case presents a legal question that requires *de novo* review. Here, the Board did not reach the issue as to whether plaintiff had met her evidentiary burden in demonstrating her eligibility to receive a widow's supplemental annuity, which would have required the Board to make factual determinations, such as weighing documentary evidence and witness testimony. Instead, the Board's analysis hinged on the construction of sections 5-144 and 5-154 of the Code, as applied to undisputed facts, such as Salcedo's retirement upon turning 63.[7] See *Roselle Police Pension Board*, 232 Ill. 2d at 552 (when the salient facts of a case are not in dispute, the issue before the court is one of statutory construction and therefore *de novo*); *Summers*, 2013 IL App (1st) 121345, ¶ 14 (when facts are undisputed and the appeal concerns the interpretation of the statute, the standard of review is *de novo*); see also *Bertucci v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago*, 351 Ill. App. 3d 368, 370-371 (2004) (when resolution of case depends, not on evidence heard by the board or even application of those facts to the law, but purely under the legal question of the proper interpretation of statutory provisions regarding annuity benefits for widows of firefighters, our review is *de novo*). Thus, we proceed to our analysis under a *de novo* standard. However, we would reach the same conclusion in this case regardless of the applicable standard.

¶ 55    B. Whether the Code Prohibits the Granting of a Widow's Supplemental Annuity

Following Mandatory Retirement

¶ 56    The issue on appeal is what effect, if any, did Salcedo's mandatory retirement, and subsequent cessation of his disability benefits, have on plaintiff's eligibility to receive a widow's

---

[7]We also observe that, although not directly on point, in cases involving whether an officer's disability arose from an "act of duty" and the facts are virtually undisputed, the interpretation of the term "act of duty" has been characterized as an issue of statutory construction, and is therefore reviewed *de novo*. See *Sarkis v. City of Des Plaines*, 378 Ill. App. 3d 833, 836-37 (2008) (collecting cases).

supplemental annuity. Plaintiff, citing *Swoope*, 323 Ill. App. 3d 526, contends that Salcedo's retirement is irrelevant, and that the focus of the Code is whether the officer was permanently disabled from returning to duty. The Board disagrees, because, according to its interpretation of the Code, Salcedo no longer qualified as a "disabled officer" or "policeman," as his disability benefits had converted into a lifetime annuity under section 5-154(c). The Board further contends that *Swoope* does not address the issue of how mandatory retirement affects the granting of supplemental annuities under section 5-144(c). As such, the Board urges us to review the Code in its entirety as plaintiff's isolated interpretation would create absurd results that would subject the fund to "monumental exposure."

¶ 57     In this appeal we are tasked with construing various provisions of the Code. It is well established that "[t]he primary rule of statutory construction is to ascertain and effectuate the legislature's intent," where "[t]he best evidence of [which] is the language in the statute itself, which must be given its plain and ordinary meaning." *Id.* at 530. "To do so, words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." *Id.* "[E]ach provision [must be] construed in connection with every other section," and "[i]f legislative intent can be discerned from the statutory language, this intent must prevail, and no resort to other tools of statutory construction is necessary." *Roselle Police Pension Board*, 232 Ill. 2d at 552.

¶ 58     Plaintiff points out that the terms contained within pension codes, such as the one before us now, should be liberally construed in favor of the applicant in order to effectuate the purpose of the statute. See *Sullivan v. Retirement Board of Firemen's Annuity & Benefit Fund of Chicago*, 267 Ill. App. 3d 965, 970-71 (1994). However, this principle creates no exception to the rules of statutory construction. See *Roselle Police Pension Board*, 232 Ill. 2d at 552. If legislative intent is

obvious within the pension act, this "liberal construction canon does not authorize the judiciary" to create new meaning. *Id.* at 553. Further, although a reviewing court is not bound by an agency's interpretation of the statute, the Board's reading of the Code " 'remains relevant where there is a reasonable debate about the meaning of the statute.' " *Sarkis v. City of Des Plaines*, 378 Ill. App. 3d 833, 837 (2008) (quoting *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 142 (2006)).

¶ 59        1. The Relationship Between Compensation and Supplemental Annuities

¶ 60    As a preliminary matter, we must first address a threshold issue that we believe the parties overlooked in this litigation. Section 5-144 of the Code, titled "Death from injury in the performance of acts of duty," governs disbursement of both compensation and supplemental annuities. 40 ILCS 5/5-144 (West 2020). Section 5-144(a) provides that a compensation annuity may be awarded to a widow whose deceased husband, "had he lived," would have attained age 63. *Id.* § 5-144(a). Section 5-144(b) then provides that, "*[u]pon termination of the compensation annuity*, 'supplemental annuity' shall become payable to the widow" based on the amount the policeman would have been receiving "when he attained age 63." (Emphasis added.) *Id.* § 5-144(b). Based our reading of these two provisions, it appears that receipt of the supplemental annuity is conditioned upon the widow's eligibility, entitlement, and actual receipt of the compensation annuity.

¶ 61    Prior versions of section 5-144 also support this interpretation. The 1969 version of the same provision is very similar, where the phrase "upon termination" was previously drafted as "thereafter":

      "§ 5-144. Death from injury in the performance of acts of duty—minimum and maximum annuity—compensation annuity and supplemental annuity. If the annuity for the widow of

a policeman whose death, on or after the effective date of this amendatory Act of 1969, results from injury incurred in the performance of an act or acts of duty, is not equal to the sum hereinafter stated, 'Compensation annuity' equal to the difference between the annuity and an amount equal to 75% of the policeman's salary *** that would ordinarily have been paid to him as though he were in active discharge of his duties shall be payable to the widow until the policeman, had he lived, would have attained age 63. ***

> *Thereafter*, 'Supplemental Annuity', equal to the difference between the annuity for the widow and the annuity she would have received if the policeman had continued in service at the salary in effect at his death until he attained age 63, shall be payable to her."[8]

(Emphasis added.) Ill. Rev. Stat. 1969, ch. 108½, ¶ 5-144.

¶ 62    The record does not reflect that plaintiff was ever in receipt of a compensation annuity. Indeed, in plaintiff's original claim to the Board, she had specifically stated that she was receiving a "standard widow's annuity" and was applying for a *compensation annuity.* Further, the hearing transcript indicates that the Board had been prepared to hear evidence regarding a claim for a compensation annuity, and it was plaintiff's counsel who then stated in his opening remarks that plaintiff was actually seeking a "supplemental annuity." Thereafter, the Board denied plaintiff's request and characterized it as one for a "supplemental annuity." Further, the parties have continued to argue throughout the duration of this litigation that plaintiff was only seeking a supplemental annuity.

---

[8]The 1963 versions of the statute also contained the "thereafter" language when discussing supplemental annuities for widows. See 1963 Ill. Laws 161; see also 1963 Ill. Laws 3016. The 1995 version of the statute begins using the phrase "Upon termination" rather than "thereafter." See Pub. Act 89-12, § 5 (eff. Apr. 20, 1995) (amending 40 ILCS 5/5-144).

¶ 63    If in fact plaintiff was solely seeking a supplemental annuity, then it appears that her claim should have been denied at the outset and prior to any determination that the retirement age precluded entitlement to such a benefit. Although it is true that plaintiff would have to meet the same evidentiary burden as to either a compensation or supplemental annuity with regard to establishing the nature of her husband's injuries, she would have to go one step further for a supplemental annuity, namely, to prove that she had already received a compensation annuity as defined in section 5-144(a) and further expanded upon in section 5-144(c). Here, plaintiff did not show that she had been in receipt of a compensation annuity, and the plain language of the statute indicates that a supplemental annuity may only become payable "[u]pon termination of the compensation annuity." 40 ILCS 5/5-144(b) (West 2020). Only after that threshold requirement was met would the Board then be able to assess the claim for a supplemental annuity under section 5-144(c), which requires a widow to show that her husband's death "was a direct result of the injury, or [that] the injury was of such character as to prevent him from subsequently resuming service as a policeman." *Id.* § 5-144(c).

¶ 64    Accordingly, in determining whether plaintiff was eligible for a supplemental annuity, we believe that plaintiff's claim was unsuccessful at that threshold issue. Nevertheless, as we discuss below, plaintiffs' appeal still fails even on the merits of the arguments raised.

¶ 65    C. Whether Salcedo's Retirement Precluded His Widow's Receipt of Such Annuities

¶ 66    As noted by both parties, our court has had few occasions to interpret section 5-144 of the Code, as there appears to have been a lack of substantive changes to the provision since its initial

passage in 1963.[9] However, we have had occasion to do so with regard to section 5-144(c) in *Swoope*, 323 Ill. App. 3d 526.

¶ 67 There, the plaintiff was the widow of a police officer who received duty disability benefits following an on-duty accident, until his death from unrelated causes. *Id.* at 527-28.[10] The plaintiff, after receiving both a widow's annuity and death benefit, applied for a widow's compensation annuity pursuant to section 5-144. *Id.* at 528. Following an evidentiary hearing, the Board determined that the plaintiff failed to meet her burden on her claim because she did not present any medical testimony or evidence regarding her husband's health or ability to return to work at time of death. *Id.* On appeal, the plaintiff argued that the Board's decision was in error because, according to the plaintiff, the widow of an officer who dies while receiving duty disability benefits and has not returned to work since the injury is *automatically* entitled to a widow's compensation annuity based on the fact that the officer had been receiving disability benefits at the time of death. *Id.* at 529.

¶ 68 We first identified the purpose of section 5-144 and determined that this provision of the Code was specifically intended to benefit widows by providing "extra compensation, above the regular annuity determined in [other] sections, to [a] select group of widows." *Id.* at 529-30. We stated that "the legislature clearly intended only widows whose husbands died as a direct result of injuries sustained in the performance of acts of duty to benefit from compensation and supplemental annuities." *Id.* at 531. Therefore, section 5-144(c) was a "narrow expansion of this

---

[9]In 1969, section 5-144 was amended to modify the retirement age from age 57 to 63. See Pub. Act 76-1387, § 1 (eff. Sept. 17, 1969) (amending Ill. Rev. Stat. 1967, ch. 108½, ¶ 5-144).

[10]*Swoope* does not expressly indicate that the police officer therein was under the age of 63, but there is no mention in the opinion that he was close to, near, or at retirement age. Rather, the opinion indicates that he was still receiving disability benefits prior to his death, which he could not have received if he had been at or above retirement age per the Code. *Swoope*, 323 Ill. App. 3d at 528; see also 40 ILCS 5/5-154(a) (West 2020).

section, allowing widows of officers whose injuries were of such character as to prevent them from subsequently resuming service as policemen to also receive this extra compensation." *Id.*

¶ 69    We then rejected plaintiff's interpretation of section 5-144(c), in that she was *automatically* entitled to receive a compensation annuity simply because her husband had previously received duty disability benefits. *Id.* We looked to the plain language of section 5-144(c), focusing specifically on the word "subsequently" contained therein. *Id.* We determined that the term:

> "refer[red] to an injury incurred in the performance of an act of duty which prevents the officer from resuming service as a policeman subsequent to, or following, that injury. If, at anytime after the injury, the officer can or could possibly resume his duties as a policeman, his widow is excluded from receiving compensation or supplemental annuities. Because the statute does not define an ending point to this time period, we interpret the phrase to mean that the injury was so severe, and of such a character, as to prevent the officer from ever resuming service as a policeman. Thus, *it is the officer's injury*, and not his death, which establishes whether the officer would be able to subsequently, and at some point, resume his duties with the police department." (Emphasis added.) *Id.*

¶ 70    Thus, in order to prove eligibility for a widow's compensation annuity, the *Swoope* plaintiff had to establish that either (1) her husband's death was a direct result of the injury he sustained while in the performance of an act of duty or (2) his injury had been of such a character as to prevent him from subsequently resuming work as a policeman. *Id.* at 529. The first condition could not be met, thus we looked to the second. *Id.* at 531. Under the second condition, we determined that a plaintiff needed to "establish[,] with medical evidence and testimony[,] that her husband's injury, *but for his death*, would have prevented him from subsequently, or ever, resuming service with the police department." (Emphasis added.) *Id.* Although we agreed with the Board's

interpretation of the provision, we nevertheless determined that the record was not sufficiently developed to show whether the plaintiff's burden had been met, and we remanded the case for a new evidentiary hearing. *Id.*

¶ 71   *Swoope* is helpful to contextualize the intent and practical operation of section 5-144(c), but it does not address the central issue before us today. For instance, in *Swoope*, the plaintiff's husband appears to have died prior to retirement age, and the annuity at issue was compensation, not supplemental. Further, although the *Swoope* court noted that "the statute does not define an ending point to th[e] time period" of when an "officer can or could possibly resume his duties" and thus prevent his widow from receiving either compensation or supplemental annuities, that issue was not explored by the court. *Id.* Thus, to determine whether mandatory retirement forecloses the possibility of a supplemental annuity for a widow whose husband died after age 63, we must return to the plain language of the statute.

¶ 72   Based on our review of the relevant provisions of the statute, we agree with the Board that Salcedo's mandatory retirement precluded the plaintiff from receiving a widow's supplemental annuity pursuant to the Code. Sections 5-144(a) and (b), which govern compensation and supplemental annuities for widows of deceased officers, apply to circumstances in which an officer died *prior to* retirement, not after. See 40 ILCS 5/5-144(a) (West 2020) (compensation annuity shall be paid to a widow based on what the police officer "would ordinarily have been paid *** as though he were in active discharge of his duties *** *until the policeman, had he lived, would have attained age 63*" (emphasis added)). Put another way, per section 5-144(a), a widow is eligible for a compensation annuity only if her husband's death resulted from a duty-related injury *prior to age 63*, which is before the age of retirement. In such a case, the compensation annuity terminates on the date the officer would have turned 63, had he lived. After the termination of a compensation

annuity, the widow is then eligible to receive a supplemental annuity in the amount the officer's salary would have been had he lived to retirement age, again age 63. *Id.* § 5-144(b) (supplemental annuities shall equal the amount that "the *policeman would have been receiving when he attained age 63 if the policeman had continued in service* at the same rank" (emphasis added)).

¶ 73    Section 5-144 does not address the awarding of such benefits to widows of officers if the officer died after age 63. This makes sense based on the complete reading of the statute. Sections 5-144(a) and 5-144(b) contemplate the calculation of the amount of the annuities based on the theoretical and continuous service of the deceased police officer up until age 63, which is the age when the officer is no longer able to work for the department. Thus, as noted by the court in *Swoope,* such annuities are meant to serve as "extra compensation" to a widow whose husband could no longer receive standard compensation from the department, and who perhaps otherwise would be eligible for duty disability benefits that would cease upon age 63, as they did for Salcedo here. See *id.* § 5-154(c) ("Duty disability benefit shall be payable until the policeman becomes age 63 or would have been retired by operation of law, whichever is later ***.").

¶ 74    Nevertheless, plaintiff argues that the age of 63 as discussed within this section is of no import, as the mandatory retirement age for police officers in Illinois differs based on location. Thus, according to plaintiff, there are jurisdictions where Salcedo might have been able to work after age 63, but for his disability.[11] But this argument appears misplaced, as plaintiff may not have been eligible to receive a compensation or supplemental annuity from the Chicago Police

---

[11]The Board argues that plaintiff's argument on this point is waived, as it was never presented to the circuit court in prior briefing or oral argument. We interpret plaintiff's argument on this point as simply an attempt to support her overall position that mandatory retirement should not bar her eligibility for a widow's supplemental benefit, which was raised below. We further observe that neither party had the opportunity to adequately discuss this issue prior to the Board's vote, and the circuit court was the first tribunal to hear any sort of developed argument on this issue.

Department, which are annuities based upon the presence of a debilitating injury, if she or her husband were in receipt of any such income from other jurisdictions. Per section 5-216 of the Code:

> "When annuity or benefit not payable. Except as may be otherwise provided herein, no annuity, pension or other benefit shall be paid to a policeman or widow *** by virtue of a temporary appointment; and no disability benefit shall be paid for any period during which he is receiving wages or compensation from any statutory body supported in whole or in part by taxation; and no annuity shall be paid to any policeman or widow who has received a refund of salary deductions or other contributions unless such amount *** shall have been repaid into the fund ***." *Id.* § 5-216.

¶ 75    A similar limitation is outlined in section 5-157 of the Code, where a police officer is not entitled to receive any such disability benefits if the officer assumes regular employment for compensation or if the officer re-enters public service in any capacity. See *id.* § 5-157(c), (f).

¶ 76    Further, as a matter of policy, the Board points out that the awarding of a supplemental annuity to a widow whose husband died after retirement may also be unworkable. The Board reasons that, because Salcedo was no longer in service, he was not required to submit to mandatory physical examinations per section 5-156 of the Code in order to determine whether he was still eligible for certain benefits and annuities based on his disability. *Id.* § 5-156; see also *id.* § 5-157 (policeman not eligible to receive duty disability benefits if he refuses to submit to physical examination). This is significant, because the record does not appear to indicate that the Board ever made a finding of a permanent disability as applied to Salcedo. See *id.* § 5-154(a)(iii). As such, according to the Board, opening the door to widows of police officers who died after retirement would expose the fund to administrative and financial difficulties.

¶ 77    Although the Board's concern is not conclusive to the resolution of this issue, it is not unjustified. Here, plaintiff did not file her request for benefits until 2021, about three years after her husband's death. There is no dispute that the weight of the medical evidence showed that Salcedo was either permanently disabled, still disabled, or, at best, in a position to return to light desk duty. But following Salcedo's retirement, there do not appear to be any medical reports or records in evidence that discussed Salcedo's condition after his retirement. It is true that plaintiff provided affidavits to support her contention that Salcedo's condition had been the same as when he had retired, but even those affidavits relied on medical reports and evaluations conducted prior to Salcedo reaching age 63. Thus, in the most extreme circumstances, and under plaintiff's interpretation of the Code, the Board would be required to assess a request for a supplemental annuity based on potentially numerous years of missing medical records, where its appointed expert physician would be only able to make determinations based on their review of *other* doctors' conclusions, as was done here. We do not believe that this could have been the legislature's intent, based on its requirement of yearly medical examinations for receipt of disability payments, in tandem with the Code's heavy emphasis on the age of 63 as the determining factor as to what amount and when an officer's widow could be eligible for a compensation or supplemental annuity.

¶ 78    Finally, plaintiff argues that the circuit court's reliance on *Bertucci*, 351 Ill. App. 3d 368, was misplaced, as the firemen's pension code with regard to widow's supplemental annuities is distinguishable from the Code here. We note that the circuit court only mentioned *Bertucci* in passing in its order denying plaintiffs' complaint for administrative review. Further, our review is of the Board's decision, and while potentially informative, we do not review the decision of the

circuit court. See *Roselle Police Pension Board*, 232 Ill. 2d at 551-52. Even so, given the potential similarities of the pension code as applied to firefighters and police officers, we examine the case.

¶ 79    In *Bertucci*, which was decided three years after *Swoope*, the plaintiff was the widow of a permanently disabled firefighter who received duty disability benefits following an on-duty accident. *Bertucci*, 351 Ill. App. 3d at 369. The firefighter never returned to work and later died from metastatic lung cancer. *Id.* The firefighter's widow applied for a widow's duty related annuity with the firefighter pension board, and the board granted and denied in part her request, as it determined that the firefighter had not died while in the performance of an act of duty. *Id.* at 369-70. The widow filed a complaint for administrative review, and the circuit court reversed the board's decision. *Id.* at 370. The board appealed, and the plaintiff's arguments mirrored those of the plaintiff in *Swoope*, namely that she was entitled to a duty-related annuity benefit because a firefighter who is permanently disabled during his course of duty, but dies without returning to work, should still be treated as a firefighter who was killed in the line of duty or from injuries received directly within the line of duty. *Id.* at 370, 372. Notably, as in *Swoope*, it did not appear that the firefighter had died *after* retirement, but rather, prior.

¶ 80    In its analysis, our court cited *Swoope* favorably when assessing the relevant provisions of the firefighter code, finding that it and the police code were "nearly identical." *Id.* at 371. Thus, we adopted the holding and reasoning of *Swoope*, determining that the firefighter's widow had to meet the same evidentiary burden under section 6-140 of the firefighter code as required under section 5-144(c) of the police code. *Id.* at 373-74. We further agreed that plaintiff was entitled to the benefit "upon the fire fighter's death *and prior to his reaching the age of retirement*." (Emphasis added.) *Id.* at 379. We further observed, in a footnote, that:

"[w]hen each fire fighter would have reached the age of mandatory retirement, the families would have been treated identically, each receiving 50% of [the] active salary. 40 ILCS 5/6-141.1 (West 2000). Thus, the added financial burden on the [b]oard spans the years from the fire fighter's *death to the time he would have reached mandatory retirement age*. *When the fire fighter dies while on duty disability after reaching mandatory retirement age, no additional widow's annuity benefit is paid.*" (Emphasis added.) *Id.* at 378 n.2.

¶ 81     Notably, the firefighter code does not appear to distinguish between "compensation" and "supplemental" annuities in the same way as does the police code. See 40 ILCS 5/6-140 (West 2020). Section 6-140 solely provides for a general annuity to a widow based on the firefighter's death while on duty. *Id.*[12] Nevertheless, although based on a different article of the pension code, *Bertucci*'s discussion as to the effect of mandatory retirement in relation to the payment of a widow's annuity benefit is persuasive, given the other similarities of the provisions and the intent of the legislature in both scenarios.

¶ 82     However, plaintiff continues to split hairs, arguing that there is a significant difference between the firefighter code and the police code, where, under the former, a firefighter widow is limited to receiving a supplemental annuity up until the date of a firefighter's retirement, whereas under the police code, a widow is not so limited. We do not agree with that interpretation, and to the extent that there are any differences between the two, they are not dispositive.

¶ 83     Plaintiff's cited section of the firefighter pension code, section 6-141.1, provides that the widow of a firefighter, who died while receiving a retirement annuity, shall only receive an annuity at a specific percentage. See *id.* § 6-141.1(a), (c) ("(a) Notwithstanding the other provisions of this

---

[12]It appears that any previous reference to "compensation" or "supplemental" annuities were stricken from the statute. See Pub. Act 92-50, § 5 (eff. July 12, 2001) (amending 40 ILCS 5/6-140).

Article, the widow of a fireman who dies *** while receiving a retirement annuity *** may elect to have the amount of widow's annuity calculated in accordance with this Section. *** (c) *** [T]he widow's annuity shall be equal to 50% of the amount of such retirement annuity at the time of *** death."). So too exists a similar provision in the police code, where a widow's annuity is capped at a certain percentage if she is the widow of a deceased policeman who received a retirement annuity at time of death. *Id.* § 5-136.1(c). Plaintiff argues that the distinguishing features of the police code are found in section 5-136.1(a), which provides that a police officer's widow may choose an alternative calculation for annuity "[n]otwithstanding the other provisions of this Article" (*id.* § 5-136.1(a)), as well as in subsection (d), which states that the provisions of section 5-136.1 "shall in no way limit any annuity otherwise payable under this Article" (*id.* § 5-136.1(d)).

¶ 84    Plaintiff's argument is unavailing. Section 5-136.1 provides for an *alternative* calculation of a general widow's annuity, which is discussed throughout other sections of the Code, such as in sections 5-134, 5-135, and 5-136. See *id.* §§ 5-134 to 5-136. Section 5-136.1 simply reiterates that a widow may still be *eligible* for other annuities within the statute. However, just because a widow may not be prohibited from seeking other annuities does not mean she is in fact entitled to receive them. This is demonstrated by the fact that, at least with regard to section 5-144(c), a widow must still meet the individual requirements of a compensation or supplemental annuity in order to receive such benefits.

¶ 85    Accordingly, notwithstanding our threshold determination that plaintiff could have never been eligible for a supplemental annuity because she never received the requisite compensation annuity as required by the Code, we agree with the Board's ultimate conclusion. Salcedo's mandatory retirement was the unavoidable and intervening reason that plaintiff did not qualify for

a widow's supplemental annuity, even if the evidence may have established that Salcedo was permanently disabled from his on-duty injury at the time of his death. Simply put, Salcedo was statutorily prohibited from returning to work at age 63 for purposes of the Chicago-based pension fund, and section 5-144(c) only contemplates the awarding of such benefits to widows of officers who have died from on-duty injuries or whose injuries resulted in permanent disability before the age of 63. As such, we do not find that the Board erred in denying plaintiff's application.

¶ 86    Because we dispose of the appeal on this threshold basis, we need not reach the secondary issue of whether plaintiff met her burden under section 5-144(c) in proving that Salcedo's duty-related injuries had permanently prevented him from resuming police duty.[13]

¶ 87                                III. CONCLUSION

¶ 88    For the reasons stated, we affirm.

¶ 89    Affirmed.

---

[13]Moreover, even if we were able to reach this issue, the Board did not rule on this matter during the evidentiary hearing. As such, we would deem the record as insufficiently developed for purposes of our review.

*Salcedo v. Retirement Board of the Policemen's Annuity & Benefit Fund of Chicago*,
**2023 IL App (1st) 220728**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2021-CH-3035; the Hon. Alison C. Conlon, Judge, presiding. |
| **Attorneys for Appellant:** | Michael Rothmann, of Law Office of Martin L. Glink, of Arlington Heights, for appellant. |
| **Attorneys for Appellee:** | Richard J. Reimer and Vincent C. Mancini, of Reimer Dobrovolny & Labardi PC, of Hinsdale, for appellee. |